City of Ft Worth v. JOhnson
















IN THE
TENTH COURT OF APPEALS
 

No. 10-00-359-CV

     CITY OF FORT WORTH,
                                                                         Appellant
     v.

     EMMITT JOHNSON,
                                                                         Appellee
 

From the 249th District Court
Johnson County, Texas
Trial Court # 249-5-99
                                                                                                                
                                                                                                         
DISSENTING OPINION
                                                                                                                

      Agreeing with the majority in part, my dissent focuses on the holding that the evidence is
factually insufficient to support the trial judge’s findings that a causal connection existed between
Johnson’s reports of violations of law and the City’s decision to terminate his employment.
CITY’S CONCESSION AT ORAL ARGUMENT
      We heard oral argument on January 18, 2002. On February 1, Johnson filed a post-submission letter-brief, which states:
During the City’s rebuttal argument on January 18, 2002 before the Court, the attorney
for the City of Fort Worth conceded that this is probably not a causal link case because there
was arguably two of the five types of evidence required by the Texas Supreme Court under
the Texas Whistleblower Act in City of Fort Worth v. Zimlich, 29 S.W.3d 62, 69 (Tex. 2000). 
Instead, counsel for City of Fort Worth said that there was no evidence or insufficient
evidence that Plaintiff Johnson made a report and that report was made in good faith.

Later in the letter-brief, Johnson asserts:
 
Again, during oral argument, the City conceded this was not a causal link case because
Plaintiff Johnson had arguably shown at least two of the five types of evidence that can
support a finding that a report is causally linked to a report of a violation of law. However,
the record contains evidence of all five types of evidence that may support a causal link.

The City filed a post-submission brief on February 5, which does not controvert Johnson’s
characterization of the City’s position at oral argument. Its brief first states, “Johnson’s letter
brief requires only a brief rebuttal.” It then argues that (a) Johnson’s reports of violations of City
policy are not “violations of law” under the Whistleblower Act and (b) his reports were not made
in good faith.
      I join the majority in rejecting the City’s primary arguments in its appeal, i.e., issues one,
five, and twelve concerning good faith reports of violations of law. Because we agree about those
issues and because the City has conceded that its arguments about a causal connection are not well-founded, I would reject its issues attacking the trial judge’s liability findings. Furthermore, an
analysis of the evidence demonstrates that those finding are supported by factually-sufficient
evidence.
THE TERMINATION PROCESS
      Stanley Scott, Superintendent of the Street, Light & Signal Department, sent Sonny Stafford,
Emmitt Johnson, and Roscoe Dixson a notice dated June 5, 1997, that they were being placed on
“administrative leave with pay” pending investigation of “allegations of inappropriate behavior”
involving dumping of material on Stafford’s personally-owned property, which was outside the
city limits, and use of a city-owned tractor on his property. On June 24, Scott notified Johnson
that the City was considering termination of his employment. After a “pre-termination hearing”
held on July 1, Scott immediately terminated Johnson’s employment in a letter that acknowledged
that Johnson had defended himself on the basis that (1) that he was being retaliated against because
of his involvement with the Association of City Employees (A.C.E.) and (2) permission had been
granted for dumping of city material on Stafford’s property. On July 9, Johnson filed a
“Grievance/Appeal Report Form” designated by him as an “appeal” and a “discrimination
complaint” stating that he was “following orders” in the approved dumping of material on
Stafford’s property, that he was terminated for “reporting improper employment decisions as a
representative of A.C.E.,” and that the use of the tractor had been authorized by Scott, who was
not disciplined. Hugo Malanga, Director of the Transportation and Public Works Department,
did the “step 1 review” of the termination appeal on August 27 and told Johnson in a letter that
he did not “find sufficient evidence to overturn the recommendation of termination by Stanley
Scott, Street Superintendent.” Johnson elected to bypass step 2 of the appeal process (review by
the Human Resources Department) and appealed directly to the Disciplinary Appeals Board (step
3).
      Dixson and Stafford had also appealed to the Board. On September 11, the City Attorney sent
the Board a “position statement” which posed three questions as to each employee: (1) were the
facts of the tractor-dumping incident true?; (2) did the City follow its policy in the disciplinary
action taken?; and (3) was termination warranted under the circumstances? The board, composed
of three residents of Fort Worth who were not city employees, held a joint three-day open hearing
of the three employees’ appeals of the decisions to terminate their employment. The board made
three sets of findings, stated three “additional considerations” to justify its recommendation, and
recommended to the City Manager that the decision to terminate employment be reversed as to
each of the three employees. It found:
      1.   A revised policy regarding dumping of dirt on private citizens’ property had not been
distributed to everyone who needed to know; a new “dump release” was not issued along
with the revised policy; use of an old form was not sufficient grounds for termination;
 
      2.   The fact that Stafford’s property was located outside the city limits should have been
known to him and could be a ground for disciplining him; it was not a proper basis to
discipline Dixson or Johnson;
 
      3.   The City’s allegation that top-soil was delivered to Stafford’s property, rather than
debris, was not supported by the testimony;
 
      4.   If the dumping were grounds for termination, several other employees who also
transported and dumped material there should be terminated;
 
      5.   Use of the tractor could be grounds for termination but for Scott’s giving permission for
its use; the board believes that such permission was given by Scott; it is not reasonable
to discipline employees who asked for permission unless the individual who granted
permission is also disciplined;
 
      6.   The City acted inconsistently in handling the issue; Jolly was reinstated because of his
testimony about permission from Scott, whereas the other three were terminated because
of Scott’s denial of permission;
 
      7.   Although the City reserves the right to suspend “disciplinary sequence,” the explanation
for doing so in these three cases was not justified;
 
      8.   Termination was not warranted as to Dixson, Johnson, or Stafford.

      Among the “additional considerations” stated by the Board was its view of a tape recorded
conversation Johnson had had with Scott, which it found “impossible to ignore.” The Board
expressed concern about the circumstances under which it was made, i.e., secretly by Johnson,
but concluded from the tape that Scott had given his permission, in spite of his denials. The Board
also observed that in the conversation, Scott made statements like: (a) “the white boys are out to
get you” and (b) Pete Nelson, the Human Relations manager, was “obsessed to get rid of Emmitt
Johnson.”
      Based on its findings, the Board concluded, in response to the City Attorney’s three inquiries,
that: (1) although the dumping occurred and the tractor was used, the policy was not properly
distributed, the employees other than Stafford had no reason to know that his property was outside
the City, only debris was dumped, other employees transported material there, Scott gave “some
type of permission,” and the City’s position was inconsistent in its handling of the issue; (2)
although the City had the right to suspend the disciplinary sequence, it was not justified in this
instance; and (3) termination was not warranted.
      On December 23, 1998, Rufino Mendoza, Human Resources Manager, sent Dixson, Johnson,
and Stafford a copy of the Board’s findings and recommendations and a copy of City Manager Bob
Terrell’s decision to (a) follow the Board’s recommendation to reverse the termination of Dixson’s
employment but (b) reject the Board’s recommendations with respect to Johnson and Stafford,
whose terminations were upheld. The letter also included a copy of a Memorandum from Ramón
Guajardo, an Assistant City Manager, which formed the basis for Terrell’s decision.
THE TRIAL JUDGE’S FINDINGS
      To fully understand this case, one must know what facts were found. Findings of fact made
by the trial judge, sitting as the factfinder, enjoy the same status as findings of a jury. Anderson
v. City of Seven Points, 806 S.W.2d 791, 794 (Tex. 1991). They are subject to attack on grounds
of legal and factual insufficiency, the same as a jury’s findings. Hitzelberger v. Samedan Oil
Corp., 948 S.W.2d 497, 503 (Tex. App.—Waco 1997, pet. denied) (“In evaluating a claim
regarding sufficiency of the evidence, the same standard is used for a bench trial as for a jury
trial.”) (citing Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996)). Unchallenged findings of fact
are binding on a reviewing court unless the contrary is established as a matter of law or there is
no evidence to support the findings. See McGalliard v. Kuhlmann, 722 S.W.2d 694, 696 (Tex.
1986).
      The judge made these findings of fact (grouped for ease of reference) about Johnson’s work
history:
      •    Johnson, an eleven-year employee of the City, had received above-average employment
evaluations and, for the five years preceding his termination, had not been reprimanded,
put on probation, or suspended (Findings 1, 2 and 3);
 
      •    As a member of the Association of City Employees, an organization that sought to
promote and protect the interests and rights of the City’s employees, Johnson acted as the
“employee representative” with regard to employee disciplinary actions proposed by the
City (Findings 4, 5, 6, and 7).

The judge made these findings concerning reports of violations of law:
 
      •    In his capacity as employee representative, Johnson reported violations by the City of its
own policies to those in the City responsible for administering those policies (Findings
8, 11 and an un-numbered Finding between Findings 23 and 24);
 
      •    The policies about which he reported violations were adopted pursuant to the City
Charter, City Code, and City Ordinances (Findings 9 and 21);
 
      •    The directors of the departments of the City and the Disciplinary Appeals Board of the
City to whom the reports were made were “law enforcement agencies” (Finding 10);


 
 
      •    Johnson reported violations of the City’s policies to the appropriate person in the City in
the following specific instances:
 
            1.   Violation of policies regarding the operation of City-owned vehicles and the
disciplinary action in the case of Roger Rodriguez (Finding 14);
 
            2.   Violation of policies regarding employee work status resulting from injury and
illness and the disciplinary action in the case of Jay Daniels (Finding 15);
 
            3.   Violation of the disciplinary action policy in the case of Eric Davis (Finding 16);
 
            4.   Violation of the disciplinary action policy in the case of Lon Hagedy (Finding 17);
 
            5.   Violation of the disciplinary action policy in the case of Pamela Faison (Finding 18);
and
 
            6.   Violation of the Personnel Regulations of the City when two supervisors (of
employees against whom discipline was instituted) stole property belonging to the
City (Finding 22), reported to the City’s Human Resources Department (Finding 24);
 
      •    Johnson reported a violation of state law when the two supervisors stole property
belonging to the City (Finding 22), the report being made to the Tarrant County District
Attorney’s Office and the Fort Worth Police Department (Finding 24);
 
      •    Johnson reported violations of the policy regarding alcohol and substance abuse in the
workplace, the policy regarding a drugfree workplace, the disciplinary action policy, and
the employee assistance policy, contained in the City’s Personnel Regulations, in the case
of Elvis Babers (Finding 19);
 
      •    The drugfree workplace policy, the alcohol and substance abuse policy, and the employee
assistance policy were adopted by the City under federal law (Finding 20);
 
      •    The report concerning Babers was made within ninety days prior to Johnson’s termination
and the City did not rebut the presumption that he was terminated because of this report
(Finding 23);
 
      •    All of these reports were made by Johnson in good faith and were subjectively and
objectively reasonable (Findings 25 and 26).

These findings were made concerning the termination of employment:
 
      •    Stanley Scott authorized the use of the City’s tractor on Sonny Stafford’s property
(Finding 27); Scott knew of and authorized the dumping on Stafford’s property (Finding
46);
 
      •    Although Johnson was terminated because of the tractor, Scott was not disciplined in any
manner (Finding 28);
 
      •    Harold Jolly, another employee involved in the tractor incident, was reinstated with full
back pay; Johnson was not (Finding 30);
 
      •    Although Stafford had obtained the “dump release” required by City policy for the
dumping of rough materials on his property, he, Jolly, Johnson, and Dixson were
terminated; the release was signed by Jolly (Finding 31);
 
      •    Jolly obtained permission from Scott to allow the dumping (Finding 32);
 
      •    Scott was aware of Johnson’s representation of City employees in the grievance and
appeal process (Finding 33);
 
      •    Scott and Pete Nelson, a supervisor in the City’s Human Resources Department, attended
Johnson’s pre-termination meeting; they made the decision to terminate Johnson after that
meeting; Nelson was upset with Johnson’s reporting of violations of the City’s policies;
Johnson’s reports caused results in disciplinary proceedings that ran contrary to Nelson’s
desires (Finding 34);
 
      •    Other supervisors in Johnson’s department (Johnson was an assistant field operations
supervisor) were not disciplined for participating in the dumping on Stafford’s property
(Finding 35);
 
      •    After a three-day hearing, the City’s Disciplinary Appeals Board found that: Johnson’s
termination was not warranted, Scott lied, Scott authorized the use of the tractor on
Stafford’s property, and Scott was not disciplined for authorizing it; (the trial judge
agreed with the Board’s findings of fact) (Finding 36);
 
      •    The City did not follow its own policy of progressive discipline (oral warnings followed
by written warnings, followed by suspension and/or probation) prior to terminating
Johnson (Finding 37);
 
      •    Neither the City nor Bob Terrell, the City Manager, terminated employees who engaged
in allegedly more egregious activity than that Johnson engaged in, including instances in
which an employee was accused of paving his driveway with City equipment and in
which a supervisor allowed an exotic dancer to attend a retirement party on City property
(Finding 38);
 
      •    Terrell knew about Johnson’s reports of violations of law prior to deciding to terminate
his employment (Findings 12 and 39);
 
      •    Terrell failed to discipline Scott, who authorized use of the tractor for which Johnson was
terminated (Finding 40);
 
      •    Each of the reported violations constituted a motivating factor, separate and apart from
each other report, for Johnson’s termination (Finding 41);
 
      •    Other City employees who had engaged in more egregious conduct than Johnson were
not terminated, but were given oral/written warnings or probation or no discipline
(Finding 45);
 
      •    All the stated reasons for the City’s termination of Johnson’s employment were false
(Finding 47).

AGREEMENT WITH MAJORITY
      I begin by stating again that I agree with the majority that the Whistleblower Act does not
contain language requiring that a reported violation be for the “public good” to be the basis for
a suit under the act. Majority Opinion, slip op. at 8. I further agree that the evidence is legally
and factually sufficient to support the trial judge’s findings concerning Johnson’s good faith
reports of what he reasonably believed, subjectively and objectively, to be violations of state law
and the City’s own policies. Id. at 12. Finally, I agree that the evidence is legally sufficient to
support the judge’s findings concerning a causal connection between the reported violations and
Johnson’s termination. Thus, I agree that the City’s issues one, five, and twelve should be
overruled along with the legal-sufficiency challenges to the causation findings included in issues
two, three, four, six, and seven. 
CAUSAL CONNECTION - FACTUAL SUFFICIENCY
      I part company with the majority on the factual sufficiency review of the issues concerning
causation. Johnson had the burden of proving a causal connection between one or more of the
reported violations and his termination, and the trial court found as a fact that a connection existed
in each instance.
standards of review
      Because the City attacks the factual sufficiency of the evidence to support findings adverse to
it upon which Johnson had the burden of proof at trial, we should set aside a finding only if a
review of all the evidence, both for and against it, demonstrates that the finding is clearly wrong
and unjust. Cain v. Bain, 709 S.W.2d 175, 175 (Tex. 1986); Checker Bag Co. v. Washington,
27 S.W.3d 625, 633 (Tex. App.—Waco 2000, pet. denied). That could occur because the finding
was based on weak or insufficient evidence or because Johnson’s proof, although adequate if taken
alone, is overwhelmed by the City’s contrary proof. See Checker Bag, 27 S.W.3d at 633 (citing
William Powers, Jr. & Jack Ratliff, Another Look at "No Evidence" and "Insufficient Evidence,"
69 Tex. L. Rev. 515, 519 n.11 (1991)). We are not a factfinder. Maritime Overseas Corp. v.
Ellis, 971 S.W.2d 402, 407 (Tex. 1998). We may not pass upon the witnesses' credibility or
substitute our judgment for that of the factfinder, even if the evidence would clearly support a
different result. See id.
      In reversing for factual insufficiency, a reviewing court must detail the evidence relevant to
the issue in consideration and state why it is factually insufficient or so against the great weight
and preponderance of the evidence as to be manifestly unjust; why it shocks the conscience; or
clearly demonstrates bias. Jaffe Aircraft Corp. v. Carr, 867 S.W.2d 27, 28 (Tex. 1993); Pool v.
Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986).
      In a Whistleblower Act case, a causal link between the report of illegal conduct and the
adverse employment action may be established by circumstantial evidence. Zimlich, 29 S.W.3d
at 69 (citing Continental Coffee Prod. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996)). Some
evidence must exist from which the factfinder could reasonably infer that discrimination was a
factor in the decision process. Id. Otherwise, a finding would rest only on speculation. Id. at
70.
      The majority correctly outlines the types of circumstantial evidence that the Texas Supreme
Court has said will suffice: (1) knowledge of the report of illegal conduct, (2) expression of a
negative attitude toward the employee's report of the conduct, (3) failure to adhere to established
company policies regarding employment decisions, (4) discriminatory treatment in comparison to
similarly situated employees, and (5) evidence that the stated reason for the adverse employment
action was false. Id. at 69. The Court noted that a superior’s negative attitude, standing alone,
would be insufficient to show a causal connection. Id.
analyzing the factors
      My disagreement with the majority is in the way it analyzes the Zimlich factors. I will address
them in order, but before beginning that analysis, I point out that the majority focuses on the City
Manager, Bob Terrell, because it says he made the “ultimate” decision. No authority is cited to
support such a limitation. In fact, if the majority is correct in this analysis, every public entity
subject to the Whistleblower Act would be well advised to create a position to which it assigns the
ultimate authority in disciplinary matters, then insulate that official from all other knowledge about
employees. In that way, the employee would be unable to show, in the majority’s words, “that
the person who ultimately made the decision to fire the employee knew of the reported violation
of law made by the employee.” The “ultimate decision-maker” could always testify that he or she
had no knowledge of any reports of a violation of law by the employee but acted strictly on what
he or she knew about the particular charge that led to discipline. That cannot be the correct rule
of law.
      The City’s brief admits at page 10, and it is undisputed: “Scott terminated Johnson’s
employment” for his involvement in the tractor-dumping incident. The majority states: “Scott
initially terminated Johnson’s employment” but rejects an analysis of the circumstantial evidence
of his motive. Terrell’s role was limited to a review of the recommendation of the Disciplinary
Appeals Board, which he rejected in deciding to uphold Scott’s action terminating Johnson’s
employment. But the majority finds Terrell’s decision dispositive, contrary to precedent.
      In Zimlich, our Supreme Court discusses the factors in relation to the “decision-makers,” i.e.,
was there evidence that the decision-maker or decision-makers knew about reports, expressed a
negative attitude, failed to adhere to established policy, or stated a reason for the adverse
employment action that was false. Id. at 70. The Court discusses the “conduit” theory in which
one supervisor makes a recommendation about an employee to another innocent supervisor who
acts on the recommendation without exercising independent judgment.


 See id. Here, the
“decision-makers” were Scott and Terrell. Scott made the initial decision and, as I will show,
knew about Johnson’s reports, had a negative attitude about Johnson, failed to follow the
progressive disciplinary policy without justifying it, and falsely stated that he had not authorized
the dumping and use of the tractor. The Disciplinary Appeals Board, although not a “decision-maker,” held a hearing, found that the tractor-dumping charges were not justified, found that the
City did not follow its own policies, and concluded that termination was not warranted. Those
findings were communicated to Terrell, the other decision-maker, who rejected them. It is
undisputed that Terrell made no independent inquiry, and the inquiry that he caused to be made
did not address all the issues.
      The majority simply relies on Terrell’s testimony that he had no knowledge of Johnson’s
reports. In doing so, it ignores Scott’s role and the information communicated to Terrell by the
Board’s written report. It does not discuss the “conduit” theory at all.
      I now turn to the analysis.
      Although no one with the City has admitted that there was a connection between Johnson’s
reports and his termination, the trial judge assessed the credibility of the witnesses and believed
that sufficient circumstantial evidence existed to justify a finding that a causal connection existed. 
Our factual-sufficiency inquiry, then, should be whether the findings under the five factors are
based on evidence that is too weak or whether Johnson’s proof, although adequate if taken alone,
is overwhelmed by the City’s contrary proof. See Checker Bag, 27 S.W.3d at 633.
Knowledge of the Report of Illegal Conduct
      The record is replete with evidence that Stanley Scott, the person who initially decided to
terminate Johnson’s employment, Pete Nelson, a manager in the Human Resources Department
of the City who sat in on Johnson’s pre-termination hearing, and many other City employees knew
that Johnson had made the reports on which the court based its findings. Scott acknowledged that
he knew. The record contains letters and copies of documents that show Johnson interacting with
other City employees in his role of advocating for employees threatened with disciplinary
measures. Copies of the July 1, 1997, termination notice that Scott sent to Johnson, referring to
Johnson’s position that retaliation was occurring, were sent to (1) Hugo Malanga, Director of
Transportation and Public Works (Scott’s supervisor), (2) Linda Nelson, Director of Human
Resources, and (3) Rufino Mendoza and Pete Nelson, both in the Human Resources Department. 
The form notice of the disciplinary action shows that copies were sent to “Departmental and
Official Personnel Files.” From this evidence, the court could conclude that Johnson’s reports
of the various violations of law (which the trial judge found and which we unanimously uphold)
were well known to City officials up the chain of command. From that the trial judge could
reasonably conclude that both Scott and Terrell knew of the reports. Furthermore, the City’s own
records show that Johnson’s position that he had been and was being retaliated against because of
his actions as the employee representative was well documented.
      Terrell relied on one of his assistants, Ramón Guajardo, to conduct an “investigation” when
the decision of the Disciplinary Appeals Board came to him for review. Guajardo’s memo to
Terrell states that he reviewed the facts of the tractor-dumping incident and the findings and
recommendations of the Disciplinary Appeals Board. He focused on only facts tending to support
the charges; his memo to Terrell does not mention that the Board found that Scott authorized the
dumping and the use of the tractor. Furthermore, he did not address Johnson’s contention that his
actions as the employee representative of A.C.E. was a factor in his termination, even though
Johnson’s personnel file contained references to his belief that he was being retaliated against as
a result of those activities. Guajardo did not review Johnson’s employment history with the City
or whether Johnson had any prior disciplinary problems. At trial, Terrell defended the scope of
the memo by saying that Guajardo investigated what he asked him to investigate. Nevertheless,
Terrell had access to Johnson’s personnel records and the Board’s findings and recommendations,
from which he could learn that Johnson’s prior activity as an employee representative for A.C.E.
was an issue in the disciplinary process. Regarding the limited scope of Guajardo’s investigation
and memo, the majority says, “Guajardo did not relay any information to Terrell that Johnson
thought his termination was due to his representation of city employees.” In doing so, the
majority allows Terrell to insulate himself against such knowledge.
      The majority accepts as true Terrell’s testimony that he did not know of Johnson’s actions as
an employee representative for other employees. Other evidence showing that Terrell received
letters indicating that Johnson acted in that capacity is dismissed by the majority as being five
years old; in doing so, the majority substitutes its view of credibility for the trial judge’s, who
specifically made finding number twelve that Terrell knew of the reports before deciding that the
appeals board’s recommendation should be rejected and Johnson’s termination upheld. One letter
highly relevant to this inquiry is dated September 1, 1993. It was written by Johnson to Terrell,
who was the City Manager, and affirmatively states that Johnson had been acting as the employee
representative for the city employees’ association. It charges that other city employees had
retaliated against him because of his actions as the employee representative and requests help in
resolving his own and other employees’ grievances. Because it is reasonable to infer that Terrell
would not “forget” such a letter, the trial judge could have rejected Terrell’s testimony that he did
not know about Johnson’s reports.
      The majority’s determination, based on Terrell’s testimony of his lack of knowledge of the
reports and failure to address Scott’s knowledge, does not “detail the evidence relevant to the issue
in consideration and state why it is . . . so against the great weight and preponderance of the
evidence as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias.” 
Jaffe Aircraft Corp., 867 S.W.2d at 28. I would hold the evidence is factually sufficient to
support the court’s findings that Scott and Terrell, the “decision-makers,” knew of the reports
Johnson had made. This factor weighs in favor of the trial judge’s finding of causation.
Expression of a Negative Attitude Toward the Employee's Report of the Conduct
      The evidence of Pete Nelson’s negative attitude toward Johnson’s reports is overwhelming. 
Nelson was a Human Resources Department manager who had handled employee grievances for
seventeen years until July of 1996. In that role he met with Johnson several times as the employee
representative. He said he had “concerns” about Johnson’s role and discussed them with Scott. 
He attended Johnson’s pre-termination hearing because Scott asked him to. As the majority
relates, Scott told Johnson that Nelson was upset and obsessed with “getting rid of him.” 
Although Nelson denied animosity toward Johnson, the trial judge could reasonably infer that his
view of Johnson’s reports was shared by others in the City. As the majority states, Terrell
acknowledged meeting with Nelson on a regular basis. Nelson said such a meeting was
“atypical.”
      Evidence of a negative attitude toward Johnson by Scott also appears in the record. 
Apparently there had been reports of Johnson’s making loans to other employees. By a letter
dated December 3, 1996, signed by Scott and four others as the “Employee Relations Committee,”
Johnson was told that the committee found no evidence to support “rumors” of loans, nor that he
had unfairly performed other duties as an assistant superintendent or as chairperson of the
employee relations committee. It concluded by saying, “We trust that you will . . . work towards
changing the perception that some people have of you.” Notwithstanding that exoneration, two
weeks later Scott wrote a memo to Jolly instructing him to conduct an “undercover” investigation
of Johnson’s on-the-job activities to ascertain if he was making loans and “doing his job as
assigned.” Scott wanted to know “if there are complaints from his immediate supervisor and/or
employees that he supervises.” Significantly, he wanted to know “if A.C.E. (Association of City
Employees) business is being conducted during business hours, as well as the amount of time spent
in representing A.C.E. members, etc.” He requested a written report every thirty days for the
next six months.


 From all these facts, the trial judge could infer that Scott had a negative attitude
toward Johnson that arose, at least in part, from reports he had made as the employee
representative for the association. The trial judge, as judge of the credibility of the witnesses,
could reasonably infer that others in the City shared this view, including Terrell.
      I would find that the evidence is factually sufficient to support a finding of a negative attitude
by Scott about the reports. While this factor alone cannot establish a causal connection, combined
with the other factors it weighs in favor of the finding of a causal connection.
      Finally under this factor, it should be noted that the supreme court said, “a superior’s negative
attitude, standing alone, would be insufficient to show a causal connection.” Zimlich, 29 S.W.3d
at 69 (emphasis added). Nelson was not Johnson’s supervisor; Nelson was a manager in the
Human Relations Department, the department that regularly dealt with employee disciplinary
manners. In this particular instance, I would give his negative attitude toward Johnson some
weight.
Failure to Adhere to Established Policies Regarding the Employment Decision
      The evidence shows that the City had a policy of using a “disciplinary sequence” that
progressed through a verbal warning, written reprimand, two steps of written reprimand coupled
with a temporary reduction in pay or suspension period, probation, and termination. The policy
provided that four disciplinary actions in two years was a ground for termination, and “the
sequence may be modified or waived in certain circumstances by the Division head. (e.g.
suspension without pay, probationary periods).” The trial judge found that the City did not follow
this policy of using “progressive discipline” in punishing Johnson for the tractor-dumping
incident. It is undisputed that Johnson was terminated by Scott rather than being given a verbal
warning, written reprimand with or without a pay reduction or temporary suspension, or
probation. Scott’s July 1 letter to Johnson informing him of his termination of employment
provided no justification for why the disciplinary sequence was not followed. The Disciplinary
Appeals Board found that suspending the disciplinary sequence was not justified.
      Without analysis of the evidence, the majority says only that it is “possible” under the policy
to be terminated without prior disciplinary action. It then points out that Terrell’s decision was
made without knowledge of Johnson’s employment history, again focusing only on what Terrell
said he knew and accepting his testimony as true.
       The Disciplinary Appeals Board report was addressed to Terrell. From it, he knew that the
disciplinary sequence had not been followed in Johnson’s case. According to Terrell, neither he
nor Guajardo, upon whose “investigation” and recommendation he relied, made an effort to find
out about Johnson’s employment history or prior disciplinary record. Had either made an
investigation, he would have found that Johnson had “above average employment evaluations”
(Finding 2, which is unchallenged) and no disciplinary actions for the preceding five years
(Finding 3, which is unchallenged). Nor did Terrell or Guajardo provide any basis to justify
failing to follow the disciplinary sequence. Based on the record, the trial judge justifiably found
that Terrell knew that the City had not imposed discipline on Johnson in the sequence that it
ordinarily utilized and that no reason had been advanced for failing to do so. In holding
otherwise, the majority has failed to state why the finding is “so against the great weight and
preponderance of the evidence as to be manifestly unjust; why it shocks the conscience; or clearly
demonstrates bias.” Jaffe Aircraft Corp., 867 S.W.2d at 28.
      Furthermore, the trial judge found that the City unreasonably delayed Johnson’s hearing
before the Disciplinary Appeals Board in retaliation for his challenging his termination and
reporting that his own termination violated City policy [Finding 54]. This finding is not
challenged on appeal by the City and alone supports a finding that the City did not follow its own
policies in disciplining Johnson.
      Even without Finding 54, the evidence shows that the City had a policy that provided for a
“disciplinary sequence” and that no justification was advanced for failing to follow it in Johnson’s
case. The evidence is factually sufficient to support the trial judge’s finding that the City failed
to adhere to established policy in this employment decision. This factor weighs heavily in favor
of the finding of a causal connection.
Discriminatory Treatment in Comparison to Similarly Situated Employees
      The majority’s own recitation under this factor supports the trial judge’s finding. It (a)
recounts the disparate treatment among various employees for the tractor-dumping incident and
(b) acknowledges a conflict in the evidence regarding the extent of Scott’s permission. It fails to
state why the limited evidence it believes relevant to this finding “is . . . so against the great
weight and preponderance of the evidence as to be manifestly unjust; why it shocks the conscience;
or clearly demonstrates bias.” Id.
      In connection with the tractor-dumping incident, the trial judge found: (a) Stanley Scott, who
was head of Johnson’s department, authorized use of the tractor on property owned by Stafford,
who was a foreman in Johnson’s department (Finding 27), (b) Scott knew of and authorized the
dumping on Stafford’s property (Finding 44), (c) Scott gave permission to Jolly, assistant head of
Johnson’s department, to allow the dumping (sign the dump permit) on Stafford’s property
(Finding 32), (d) Stafford, Jolly, and Dixson were terminated for the dumping (Finding 32), (e)
Scott was not disciplined for authorizing use of the tractor on Stafford’s property (Finding 28),
(f) Jolly was reinstated with back pay after being terminated for the incident. Only one of these
findings—that Scott authorized use of the tractor—is challenged by the City. Evidence on that
finding was contested, with Stafford, Johnson, and Dixson saying Scott approved and Scott
denying it. The trial judge’s finding on that point, based on a credibility determination, should
be upheld. Furthermore, Scott was the decision-maker who initially applied discipline in a
discriminatory manner—some were terminated, others were not disciplined at all for essentially
the same conduct.
      The Disciplinary Appeals Board report was addressed to Terrell. From it, he knew that
different employees had been treated differently based on the same incident. He knew Jolly had
been reinstated; he knew that Scott had not been disciplined at all; he knew that others were
involved in dumping materials who were not disciplined. As the Disciplinary Appeals Board said:
“It is not reasonable to discipline individuals who asked for .... permission unless the individual
who granted it is also disciplined.”
      The Board recommended that Terrell reverse the decision to terminate the employment of
Dixson, Johnson, and Stafford, and pay them back wages and benefits. Terrell reversed the
decision as to Dixson, who was reinstated, but not as to Johnson and Stafford, whose terminations
were upheld. Johnson thus received discriminatory treatment in comparison to similarly situated
employees: Scott, who authorized the dumping and tractor-use, was not disciplined; Stafford,
whose culpability was greater than Johnson’s because it was his land, received the same discipline
as Johnson; Jolly, who signed the permit, was reinstated with back pay; Dixson, who hauled
material to Stafford’s property, was ultimately reinstated with back pay; other employees who
delivered materials to Stafford’s property were not disciplined.
      Terrell, as City Manager, either knew of or a reasonable investigation by him would have
revealed these disparities in treatment among the various employees. I would find the evidence
factually sufficient to support the trial judge’s finding that Johnson received discriminatory
treatment arising out of the tractor-dumping incident. This factor weighs heavily in favor of the
finding of a causal connection.
Evidence that the Stated Reasons for the Adverse Employment Action are False
      In Finding 47 the trial judge found that the stated reasons for termination are false. As the
Disciplinary Appeals Board found, material was dumped on Stafford’s property and a City-owned
tractor used there. But that should not end the inquiry because both actions, under City policy,
could be proper as far as Johnson’s involvement was concerned.
      A review of factual sufficiency of this finding requires no analysis other than a consideration
of the disputed evidence regarding whether Scott authorized the use of the tractor and the
dumping. Scott testified that he did not. Stafford, Johnson, and Dixson testified he did. The trial
judge resolved the credibility issue and found that Scott authorized use of the tractor (Finding 27)
and gave permission for City employees to dump rough material on Stafford’s property (Finding
32). As the Board noted, the “impossible-to-ignore” tape recording leads to a conclusion that
Scott gave his permission, “in spite of his denials.” Here again, the majority does not “detail the
evidence relevant to the issue in consideration and state why [the finding] is . . . so against the
great weight and preponderance of the evidence as to be manifestly unjust; why it shocks the
conscience; or clearly demonstrates bias.” Id. In holding that the evidence is factually insufficient
to support this finding, the majority has again substituted its credibility determination for that of
the factfinder. Maritime Overseas Corp., 971 S.W.2d at 407. Because factually-sufficient
evidence exists that Johnson’s activities on Stafford’s property were authorized by Scott, I would
sustain the trial judge’s finding that the stated reasons for Johnson’s discipline were false. This
finding weighs in favor of the finding of a causal connection.
CONCLUSION
      I believe that the majority has re-assessed the credibility of the witnesses and substituted its
judgment for that of the factfinder, in violation of the Supreme Court’s admonition. Id. I further
believe that the majority has failed to consider all the relevant evidence in its factual-sufficiency
review. Checker Bag, 27 S.W.3d at 633. Finally, because of these deficiencies, the majority has
failed to state reasons why the evidence is factually insufficient to support the trial judge’s
findings. Jaffe Aircraft Corp., 867 S.W.2d at 28.
      I would hold that the evidence is factually sufficient to support each of the trial judge’s
findings regarding the Zimlich factors and, in turn, sufficient to support the finding that a causal
connection existed between Johnson’s good faith reports of violations of law by the City of Fort
Worth and the City’s termination of his employment. Zimlich, 29 S.W.3d at 69. Because the
majority holds otherwise, I respectfully dissent.
 
                                                             BILL VANCE
                                                             Justice

Dissenting opinion delivered and filed April 9, 2003